IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Darrick E. Newsome, | Case No. 3:17 CV 245 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Anthony Streeter, et al., | |
| Defendants. | |

## INTRODUCTION

Defendants Anthony Streeter, John Neth, and James Orozco move for summary judgment (Doc. 40), and Plaintiff *pro se* Darrick Newsome opposes, along with a request to conduct additional discovery (Doc. 41).

## BACKGROUND

The following facts are undisputed unless otherwise noted. Newsome is a state prisoner at the Allen–Oakwood Correctional Institution (AOCI). During the time period relevant to this action, Defendants were AOCI correctional officers.

In February 2016, Newsome was meeting in an office with an Aramark food service employee and another inmate when Neth and Streeter "abruptly barged" in (Doc. 1 at 1–2). Neth and Streeter contend this meeting was unauthorized and in a restricted area (Doc. 40 at 5). Newsome argues the meeting was authorized and he "was completing his state assigned/required job duties" (Doc. 41 at 5).

Streeter and Neth then removed Newsome from the office, escorted him to the prison bakery, and ordered him to strip down. Newsome claims two female Aramark employees, Heather Cooper and "Ms. Davis," were also in the bakery (Doc. 1 at 2). Newsome then told Streeter and Neth that, "as a Muslim[,] [he] can't reveal [his] nudity in the prescence [sic] of females" (*id.*). In response, Streeter and Neth escorted him "into what was a coat closet at the back of the prison cafe" (*id.*). He was again ordered to remove his clothing, and he eventually complied (*id.*). Newsome contends the search occurred "in full view of Aramark's female employees and [other] inmates" (*id.*). Streeter and Neth argue that distance, the closet door, and their bodies obstructed Newsome from the view of bystanders (Doc. 40 at 5–7). They also claim Lieutenant Michael Ledesma, a non-party, authorized the search and was involved in confirming the closed-door meeting was unauthorized (Doc. 40-4 at 10; Doc. 40-6 at 12; *see also* Doc. 40-8 at 2; Doc. 41-3). As a result of the incident, Newsome filed several grievances.

A few weeks later, in March 2016, Defendant Orozco searched Newsome's cell at the order of Captain Collier (Doc. 1 at 3; *see also* Doc. 38 at 4). Newsome contends that during this "shakedown," Orozco damaged over $1,000 of his personal property and made comments that led Newsome to believe the search was related to his prior grievances.

Newsome alleges that this conduct violated his rights under the First, Fourth, and Fourteenth Amendments, as well as his statutory rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) (Doc. 1 at 7). He seeks monetary damages, declaratory judgment, and "any other relief as it may appear to the Court that [he] is entitled to" (*id.* at 8).

### REQUEST FOR ADDITIONAL DISCOVERY

Newsome requests the following additional discovery: (1) the AOCI cafe employee visit record sheet from February 14, 2016, and (2) all communications between S. McNamara (Inspector

of Institutional Services at AOCI) and the Warden's Office about grievance number ACI-04-16-000025. Newsome claims that the visit record sheet will show that Ledesma "never was in the cafe at the time of this incident" (Doc. 41 at 19). He further claims that the communications between McNamara and the Warden's Office will demonstrate that "McNamara only spoke with H. [C]ooper about the 2.14.16 strip search of Plaintiff, and that H. Cooper did see Plaintiff in a state of nudity" (*id.*).

Newsome's Request for Additional Discovery is construed as a Motion under Federal Civil Rule 56(d). Rule 56(d) allows a party opposing summary judgment to file an "affidavit or declaration" showing that "for specified reasons, it cannot present facts essential to justify its opposition." If it does, a court "may . . . allow time . . . to take discovery" or grant other appropriate relief. *Id.*

The Motion for Additional Discovery is denied. First, the request was not properly made because Newsome failed to submit the required affidavit or declaration. *Sandusky Wellness Center, LLC v. Medco Health Solutions, Inc.*, 788 F.3d 218, 225–26 (6th Cir. 2015). Second, Newsome has long been aware of the information underlying his request for additional discovery. *See* Doc. 40-7 (Ledesma's deposition, taken September 28, 2017); Doc. 34 (Cooper's deposition, taken September 28, 2017). Newsome also had ample opportunity to conduct discovery before the briefing schedule for summary judgment was set. He made several requests for documents, admissions, and interrogatory responses (*see* Docs. 9, 13–14), and took several depositions (*see* Docs. 19, 33–34, 37–39). And during a Record Phone Status on February 22, 2018, he "agree[d] that discovery [was] now complete" (Doc. 36). He provides no explanation as to why the records he now seeks were not, and could not have been, requested beforehand. *See Audi AG v. D'Amato*, 469 F.3d 534, 541–42 (6th

Cir. 2006). Finally, and moreover, Newsome fails to explain how the requested materials would materially impact the resolution of the pending Motion for Summary Judgment.

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It may not weigh the evidence or make credibility judgments, but must only determine whether the record contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341(6th Cir. 2006) (citation omitted).

### RLUIPA

Defendants argue that Newsome is precluded from bringing any RLUIPA claims because he has not requested "any specific injunctive relief," and instead requests only monetary damages (Doc. 40 at 3 & n.3). To the extent Newsome seeks monetary damages, such relief is unavailable under RLUIPA. *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010). *See also Cardinal v. Metrish*, 564 F.3d 794, 798–99 (6th Cir. 2009). And to the extent Newsome seeks injunctive relief, neither his Complaint nor his briefing provide a basis for such relief. He does not challenge any general prison practice or policy, but instead two specific incidents of alleged correctional officer misconduct. Nor does he allege that any of the named Defendants continue to engage in conduct substantially burdening his religious beliefs or practices. The RLUIPA claims are dismissed.

4

**Equal Protection Clause**

Newsome argues Defendants have violated his rights under the Equal Protection Clause because "likely situated prisoners are not subjected to strip searches in the presence of females and other inmates" or "subjected to retaliatory cell searches" (Doc. 41 at 10). He cites no evidence and makes no other arguments.

The Sixth Circuit has held that a prisoner cannot "make out a violation of his equal protection rights simply by showing that other inmates were treated differently." *Newell v. Brown*, 981 F.2d 880, 887 (6th Cir. 1992). Rather, he must show that he was victimized because of some suspect classification. *See Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000). Newsome does not allege, or point to evidence showing, he was subjected to the searches because of his membership in a protected class. His conclusory allegations that other prisoners were treated differently are insufficient to avoid summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

**Due Process Clause**

Newsome asserts that Orozco violated his procedural due process rights by giving "no notice or hearing before destroying [his] legally acquired and possessed non-contraband property" during the cell shakedown (Doc. 41 at 11). But the Supreme Court has held that procedural due process rights are not violated when a state employee deprives a prisoner of his property through an intentional or negligent random and unauthorized act if the state provides an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Here, Newsome was provided an adequate post-deprivation remedy through the prison grievance process, as well as through his ability to file for relief in the Court of Claims. He has neither argued nor shown

5

that these remedies were inadequate. And to the extent he argues his due process rights were violated through the grievance process itself, "[a] prisoner does not have a constitutionally protected right to an effective grievance procedure." *See Valladolid v. Mich. Dep't of Corr.*, 2017 WL 3528221, at *3 (6th Cir. 2017).

**Strip Search: First and Fourth Amendment**

Newsome alleges that the February 2016 strip search violated his First and Fourth Amendment rights because Streeter and Neth "exposed [his] nudity to females and other inmates for no legitimate penological reason" (Doc. 41 at 2). Streeter and Neth argue they are entitled to summary judgment on these claims because they had a "reasonable basis to conduct the search," and they took "reasonable measures to ensure his privacy during the search" (Doc. 40 at 2, 5). They further contend they are entitled to qualified immunity because Newsome did not have a clearly established right "not to be searched after being discovered in a backroom meeting with a non-prison official who had the potential to transfer outside contraband to him," or a clearly established right to a strip search with greater privacy measures than those used by Streeter and Neth (*id.* at 10).

Inmates retain the First Amendment right to exercise their religion, but the right is subject to reasonable restrictions and limitations. *See Bell v. Wolfish*, 441 U.S. 520, 545–51 (1979). Similarly, although "a convicted prisoner maintains some reasonable expectations of privacy," *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992), a prison's regulations need only be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Courts "review a correctional officer's discretionary actions under essentially the same deferential standard." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013).

This standard requires courts to "balance the nature of the intrusion against the need for the particular search." *Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017). *See also Florence*

*v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012). This balancing act involves a three-step analysis. First, this Court must determine the nature of the intrusion, "examin[ing] the scope, manner, and location of the search." *Stoudemire*, 705 F.3d at 572. Next, this Court must "evaluate the need for the search, giving due deference to the correctional officer's exercise of [his] discretionary functions." *Id.* Finally, this Court must "determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

### *Degree of Intrusion*

Turning first to the scope of the search, "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Id.* at 572–73 (citation omitted). "The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view [him] unclothed." *Williams v. City of Cleveland*, 771 F.3d 945, 953 (6th Cir. 2014). The level of intrusion is also compounded when the bystander is of the opposite sex, *see Cornwell*, 963 F.2d at 916, or if the strip search is conducted "in a discourteous manner." *Sumpter*, 868 F.3d at 483.

Both Streeter and Neth testified at their depositions that no females or other inmates were present during the strip search (Doc. 40-4 at 9; Doc. 40-6 at 8–9). Likewise, Cooper, one of the females Newsome alleges watched the search, stated under oath that she did not see, and was not in a position to see, Newsome undress (Doc. 40-3 at 6, 9–10, 19–20).

Newsome asserts that "Cooper lied/perjured herself during [the] deposition[]" (Doc. 41 at 6). But none of the evidence he points to contradicts her sworn testimony that she did not see the strip search. The fact that she responded "[t]hank you for your concern" to two letters from Newsome

7

cannot be reasonably construed as an admission to the content of the letters (*see* Doc. 41-2). Nor do any of the affidavits or other submitted documents demonstrate that Cooper saw, or was in a position to see, Newsome undress (*see* Docs. 41-10, 41-11, 41-12, 41-13).

Newsome does, however, provide affidavits from several witnesses stating they saw Streeter and Neth "strip searching" Newsome, and that the search occurred "in front of," or "in very close proximity to," two female Aramark employees (Docs. 41-11, 41-12, 41-13). The affidavits also suggest that Streeter and Neth made offensive comments during the search (*see* Docs. 41-11, 41-12, 41-13). But the affidavits contain very few details about the search or what the witnesses observed. They do not describe how the females, the officers, or Newsome were positioned. Nor do they offer any information as to what the female bystanders could, or could not, see. As Newsome himself admits in his Complaint (Doc. 1 at 2), the search occurred in a coat closet, supporting Streeter and Neth's contention that the view of bystanders would have been at least partially obstructed. Several of the affidavits also confirm that the search occurred in a "back office" (Doc. 41-11; *see also* Doc. 41-12). Further, two of the affidavits provide that the officers told the witnesses to "get the hell out" of the area (Docs. 41-11, 41-12), and another affiant admits only observing the incident briefly before "hurry[ing]" to work (Doc. 41-13).

Drawing every inference in Newsome's favor, these affidavits offer some support for his claim that two female workers were somewhere in the same vicinity as the strip search, and that three other inmates briefly observed the scene. The evidence, however, does not suggest that the bystanders' view was anything more than incidental or minor. And "an intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system." *Sumpter*, 868 F.3d at 483.

8

### *Degree of Need for Search*

Turning to the need for the search, Streeter and Neth both testified that Newsome was searched because he was discovered out of place, in a private area, and in an unauthorized meeting with a non-government contractor (Doc. 40-4 at 17, 20; Doc. 40-6 at 8, 19, 43; *see also* Doc. 40-7 at 7–8, 21, 25). They contend the search was justified because the contractor had the potential to smuggle "any type or quantity of unknown and dangerous contraband into the prison" (Doc. 40 at 12). Further, the contractor "provided a twice fabricated explanation for their meeting" (*id.*) -- first she stated that the meeting was authorized by Cooper, and then she stated that the meeting was authorized by Lieutenant Klenz (*see* Doc. 40-8; *see also* Doc. 40-7 at 7–8). Both Cooper and Lieutenant Klenz denied authorizing the meeting (*see* Doc. 40-8; *see also* Doc. 40-7 at 7–8).

Newsome provides no evidence to refute this account of events. Instead, he argues that the deposition testimony of Ledesma "is a complete lie/perjury" due to some inconsistencies between Ledesma's testimony and Streeter and Neth's recollection of events (Doc. 41 at 5). But the material facts are the same -- the Aramark employee provided differing accounts of who authorized the closed door meeting, and when the officers attempted to confirm her version of events, both purported authorizers denied granting approval (*see* Doc. 40-7 at 7–8, 25; Doc. 40-8; Doc. 41-3). And although Ledesma denied ordering Streeter and Neth to strip search Newsome (Doc. 40-7 at 10–11; *see also* Doc. 40-6 at 12), he testified that he did authorize the officers to look into the situation and "check the area" (Doc. 40-7 at 13–14). In any case, he also testified that Streeter and Neth did not need his approval to strip search an inmate (Doc. 40-7 at 9; *see also* Doc. 40-4 at 10).

Newsome further asserts the fact that he was never issued a conduct report shows the meeting was authorized (Doc. 41 at 5). But Streeter, Neth, and Ledesma all testified that correctional officers have some discretion in issuing conduct reports (Doc. 40-4 at 22–23; Doc. 40-6 at 10–11, 40–41, 51;

9

Doc. 40-7 at 20). And the wording of the Disciplinary Process policy supports this testimony: "[s]hould [an inmate] violate a rule of conduct; [he] *may* receive a conduct report" (Doc. 41-5 at 1) (emphasis added).

Giving due deference to Streeter and Neth's discretionary acts as correctional officers, the record supports no reason to doubt the legitimacy of the asserted justification for the search. "Unquestionably, 'detect[ing] and deter[ing] the possession of contraband' is a legitimate penological objective," even in the absence of particularized suspicion. *See Stoudemire*, 705 F.3d at 573 (alterations in original) (citation omitted). The record in this case also supports that there were some exigent circumstances heightening the need for the search, and the need for it to happen quickly.

### *Qualified Immunity*

Based on the above, this Court need go no further to determine that Streeter and Neth are entitled to qualified immunity. The doctrine of qualified immunity shields from civil liability government officials who perform discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 900 (6th Cir. 2004) (citation omitted). To determine whether a defendant is entitled to qualified immunity, courts ask two questions: (1) whether the alleged conduct violates a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "A plaintiff must satisfy both inquiries in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480.

Qualified immunity protects a government official from personal liability unless "the contours of the constitutional right" allegedly violated "were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Sumpter*, 868 F.3d at 485

10

(quoting *Plumhoff v. Rickard*, ___ U.S. ___, 134 S. Ct. 2012, 2023 (2014)). The Supreme Court has instructed that the "dispositive question" is "whether the violative nature of *particular* conduct is clearly established" in light of "the specific context of the case, [and] not as a broad general proposition." *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (emphasis in original) (citations omitted).

"Nowhere is that specificity as important as in the Fourth Amendment context, where, under the governing ad-hoc-interest-balancing test, '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Sumpter*, 868 F.3d at 485 (alteration and omission in original) (citation omitted). For this reason, "[c]ourts generally accord public officials wide latitude (for qualified-immunity purposes) when the constitutionality of their acts comes down to the subtleties of interest balancing." *Id.* (alteration in original) (citation omitted).

Newsome contends that the clearly established right at issue is the right "to practice his religion" and to be free from "strip search[es] in the presence of females and other inmates" (Doc. 41 at 8, 13). In support, he cites *Williams*, 771 F.3d 945, and *Stoudemire*, 705 F.3d 560. But these cases are not controlling.

The clearly established right recognized in *Stoudemire* and *Williams* was the right not to be subjected to "a *public* strip search," *see Sumpter*, 868 F.3d at 486–87 (emphasis added), or "a humiliating strip search *in full view* of several (or perhaps many others)" without any justification. *Stoudemire*, 705 F.3d at 575 (emphasis added). But as discussed, the evidence does not suggest that Newsome was subjected to a "public strip search" in "full view" of others. Instead, the record shows Streeter and Neth at least attempted to obstruct Newsome from view and to keep the area clear of

11

bystanders. Further, there were at least some exigent circumstances and individualized suspicion supporting the officers' decision to conduct the search quickly, perhaps in a less-than-ideal manner.

"These differences matter because the existence of a countervailing governmental interest necessarily affects the third step in the constitutional analysis, the balancing calculus. And this is critical for purposes of qualified immunity analysis." *Sumpter*, 868 F.3d at 487. After all, "[q]ualified immunity exists to give public officials breathing room to make close calls when the issue is not black-and-white." *Id.* at 488. Because no case squarely governs this situation, this Court finds Streeter and Neth are entitled to qualified immunity.

**Cell Search: Retaliation Claim**

Newsome's final claim is that Orozco violated his rights under the First Amendment by searching his cell in retaliation for grievances he filed against Streeter and Neth (Doc. 41 at 11–12). To establish a retaliation claim, Newsome must show: (1) he engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by his protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Orozco does not dispute that Newsome engaged in protected activity. He does, however, contend that he is entitled to summary judgment because Newsome failed to produce evidence satisfying the second and third prong of the retaliation analysis (Doc. 40 at 18–19). Alternatively, he argues Newsome failed to exhaust his administrative remedies (*id.* at 13–18). Newsome responds that Orozco's conduct would deter a person of ordinary firmness from filing grievances because not only did Orozco search his cell, but he also damaged several of his possessions in the process (Doc. 41 at 12). Newsome further argues that Orozco's comments during the search and the fact that the

12

search was ordered by Captain Collier, the same officer assigned to investigate his grievances, show the search was motivated by his protected conduct (*id.*).

This Court finds that Newsome has failed to produce more than a scintilla of evidence supporting his retaliation claim. First, the Sixth Circuit has stated that "[a] single shakedown, unaccompanied by excessive force, verbal threats, a pattern of previous questionable shakedowns or other such factors, would not meet the adverse action standard." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503–04 (6th Cir. 2011). *See also Tate v. Campbell*, 85 F. App'x 413, 417 (6th Cir. 2003) ("[T]he single search of a prison cubicle would not deter a person of 'ordinary firmness' from pursuing constitutional grievances.").

Second, even if the search and accompanying property damage did constitute an adverse action, Newsome has not demonstrated that the grievances he filed against Streeter and Neth were "a substantial or motivating factor in [Orozco]'s alleged retaliatory conduct." *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). Under the third prong of the retaliation analysis, "the subjective motivation of the defendant[] is at issue." *Thaddeus-X*, 175 F.3d at 399. A plaintiff "must show both (1) that the adverse action was proximately caused by an individual defendant's acts, but also (2) that the individual taking those acts was 'motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right.'" *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (citations omitted). "Conclusory allegations of retaliatory motive, 'unsupported by material facts,'" are insufficient to avoid summary judgment. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (citation omitted).

Newsome fails to establish a genuine dispute of material fact as to whether the filing of his grievances motivated Orozco to search his cell. Newsome does not dispute Captain Collier ordered the search. And other than the fact Captain Collier was assigned to investigate his grievances,

13

Newsome provides no information as to why he believes Captain Collier was motivated by a desire to punish him. Newsome does not allege that Captain Collier had any personal relationship with Streeter or Neth. Nor does he contend that Captain Collier ever threatened or otherwise demonstrated any animus towards him. Further, Newsome's retaliation claim is not against Captain Collier -- it is against Orozco, and Orozco only. Newsome provides no evidence that Orozco was involved in the investigation of his grievances, or that Orozco was even aware of the grievances.

Newsome relies heavily on comments Orozco purportedly made during the cell search. He alleges that Orozco stated "I don't want to do this but I'm being ordered to tear up your property," and swore it was not him "just being an asshole" (Doc. 1 at 3). When Newsome's cellmate asked "[t]hen what do you call it," Orozco allegedly replied "[a]n investigation" (*id.* at 3–4). Several witnesses also aver that they heard Newsome's cellmate ask Orozco why he was searching the cell, and that Orozco responded "[t]his is the investigation that your celly asked for" (Doc. 41-15; *see also* Docs. 41-16, 41-17). These comments are vague at best and are insufficient to create an inference of causation. The relationship between the cell search and Newsome's grievances is too attenuated to create more than a sheer possibility that Orozco acted with a retaliatory motive.

Finally, although not addressed by the parties in their briefing, this Court also notes that to the extent Newsome seeks compensatory damages for Orozco's actions, it seems his claim has already been addressed by the Ohio Court of Claims. *See Darrick E. Newsome v. Ohio Dep't of Rehab. & Corr.*, No. 2016-00494-AD (Ohio Ct. of Claims Apr. 14, 2017). Further, because the retaliation claim fails on its merits, this Court declines to address Orozco's argument that the claim also fails because Newsome did not properly exhaust his administrative remedies.

14

**CONCLUSION**

The Motion for Additional Discovery (Doc. 41 at 19) is denied; and the Motion for Summary Judgment (Doc. 40) is granted.

IT IS SO ORDERED.

                                               s/ *Jack Zouhary*
                                           JACK ZOUHARY
                                           U. S. DISTRICT JUDGE

                                           August 10, 2018